# 14-1208

## In the
## United States Court of Appeals
### For the Second Circuit

ERICA BERG,

*Plaintiff-Appellee,*

v.

MICHAEL SORBO,

*Defendant-Appellant,*

JOHN MILLER, OFFICER, FRANK MONTAGNA, SERGEANT,
LEONARD GALLO, EMERMAN, OFFICER, FINOIA, OFFICER,
KATTIS, SERGEANT, JOHN DOE, UNKNOWN OFFICERS,
JOSEPH MATURO, MAYOR and TOWN OF EAST HAVEN, CT,

*Defendants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

## BRIEF FOR DEFENDANT-APPELLANT

JOHN F. CONWAY, ESQ.
LOUGHLIN FITZGERALD, P.C.
*Attorneys for Defendant-Appellant*
150 South Main Street
Wallingford, Connecticut 06492
(203) 265-2035

# **TABLE OF CONTENTS**

Table of Authorities ................................................................ iii

Statement of Jurisdiction ...........................................................1

Statement of the Issues ..............................................................3

Statement of the Case ...............................................................3

    I. The Allegations of Plaintiff's Complaint ..................................4

    II. Officer Sorbo's Motion for Summary Judgment ....................................6

    III. The Events of July 19, 2009 ..................................7

    IV. Officer Sorbo's Investigation and Subsequent Arrest of Plaintiff........13

    V. The District Court Opinion ..................................17

Law and Argument.....................................................................23

    I. Standard Of Review................................................................23

    II. Qualified Immunity ................................................................25

    III. The District Court Erred In Its Application of The Corrected
       Affidavits Doctrine .................................................................28

        A. The Corrected Affidavits Doctrine...........................................28

        B. The District Court Erred In Its Application of This
           Doctrine By Not Considering Conway's Affidavit
           In The Corrected Affidavit.......................................................32

    IV. The District Court Erred In Its Conclusion That Defendant Is Not Due
       Qualified Immunity ..............................................................36

        A. Connecticut's "Interfering With An Officer" Statute ..............36

B. Defendant Is Due Qualified Immunity Given The
Undisputed Facts In Conway's Affidavit ................................44

C. Defendant Is Also Due Qualified Immunity Based
Purely On The Facts Found Undisputed By the
District Court............................................................................47

Conclusion  ...........................................................................................50

# TABLE OF AUTHORITIES

**Cases:**

*Anderson v. Creighton,*
    483 U.S. 635 (1987)......................................................................30

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986)...............................................................23, 24

*Behrens v. Pelletier*, 516 U.S. 299 (1996) ..............................................25

*Bouboulis v. Transp. Workers Union of Am.,*
    442 F.3d 55 (2d Cir. 2006) ......................................................24

*Caldarola v. Calabrese,*
    298 F.3d 156 (2d Cir. 2002) ....................................................27

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986)..................................................................24

*Coollick v. Hughes,*
    699 F.3d 211 (2d Cir. 2012) ....................................................23

*Cournoyer v. Coleman,*
    297 Fed. App'x 17 (2d Cir. 2008) .....................................31, 35

*Cowan v. Breen,*
    352 F.3d 756 (2d Cir. 2003) ......................................................2

*Cruz v. Reilly*,
    No. 3:05-cv-1524, 2007 WL 2815151
    (D. Conn. Sept. 26, 2007)...............................................43, 45, 48

*Curley v. Village of Suffern*,
    268 F.3d 65 (2d Cir. 2001) .......................................................46

*Escalera v. Lunn*,
    361 F.3d 737 (2d Cir. 2004) ................................................................*Passim*

*Harhay v. Town of Ellington Bd. of Educ.*,
    323 F.3d 206 (2d Cir. 2003) ..............................................................2, 27

*Harlow v. Fitzgerald*,
    457 U.S. 800 (1982).................................................................................25

*Holeman v. City of New London*,
    425 F.3d 184 (2d Cir. 2005) .................................................................36

*Krause v. Bennett*,
    887 F.2d 362 (2d Cir. 1989) .................................................................46

*Lee v. Sandberg*,
    136 F.3d 94 (2d Cir. 1997) ...................................................................36

*Lennon v.Miller*, 66 F.3d 416 (2d Cir. 1995).....................................................25, 27

*Lowth v. Town of Cheektowaga*,
    82 F.3d 563 (2d Cir. 1996) ...................................................................30

*Magnotti v. Kuntz*,
    918 F.2d 364 (2d Cir. 1990) .........................................................30, 35, 46

*Malley v. Briggs*,
    475 U.S. 335 (1986).................................................................................26

*Martinez v. City of Schenectady*,
    115 F.3d 111 (2d Cir. 1997) ............................................................. 29-30

*Maryland v. Pringle*,
    540 U.S. 366 (2003).................................................................................28

*Matasushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986).................................................................................24

*McColley v. County of Rensselaer,*
  740 F.3d 817 (2d Cir. 2014) ........................................................2

*Messerschmidt v. Millender,*
  132 S. Ct. 1235 (2012).............................................................26

*Miles v. City of Hartford,*
  719 F. Supp. 2d 207 (D. Conn. 2010) .......................................30

*Mitchell v. Forsyth,*
  472 U.S. 511 (1985)...........................................................1, 25

*O'Bert v. Vargo,*
  331 F.3d 29 (2d Cir. 2003) ........................................................2

*Panetta v. Crowley,*
  460 F.3d 388 (2d Cir. 2006) .....................................................27

*Pearson v. Callahan,*
  555 U.S. 223 (2009)...........................................................25, 26

*Ricciuti v. N.Y.C. Transit Authority,*
  124 F.3d 123 (2d Cir. 1997) ................................................25, 46

*Ruttkamp v. De Los Reyes,*
  No. 3:10-cv-392, 2012 WL 3596064 (D. Conn. Aug. 20, 2012) ...........40, 41

*Salim v. Proulx,*
  93 F.3d 86 (2d Cir. 1996) ..........................................................2

*Saucier v. Katz,*
  533 U.S. 194 (2001)..................................................................25

*Savino v. City of New York,*
  331 F.3d 63 (2d Cir. 2003) ........................................................2

*Smith v. Edwards,*
  175 F.3d 99 (2d Cir. 1999) .......................................................30

*Soares v. Connecticut*,
    8 F.3d 917 (2d Cir. 1993) ...............................................................28, 29, 35

*State v. Aloi*,
    280 Conn. 824 (2007) ..........................................................................*Passim*

*State v. Biller*,
    5 Conn. App. 616 (1985) ..............................................................................42

*State v. Peruta*,
    24 Conn. App. 598, *cert denied*, 219 Conn. 912 (1991) .......................*Passim*

*State v. Silva*,
    285 Conn. 447 (2008) ..........................................................................*Passim*

*State v. Williams*,
    110 Conn. App. 778 (2008) .......................................................21, 40, 42, 47

*State v. Williams*,
    205 Conn. 456 (1987) ...................................................................................37

*Stewart v. Sonneborn*,
    98 U.S. 187 (1878)........................................................................................28

*Tenenbaum v. Williams*,
    193 F.3d 581 (2d Cir. 1999) ........................................................................23

*Thomas v. Roach*,
    165 F.3d 137 (2d Cir. 1999) ........................................................................25

*Tierney v. Davidson*,
    133 F.3d 189 (2d Cir. 1998) ..........................................................................2

*U.S. v. Delossantos*,
    536 F.3d 155 (2d Cir. 2008) ........................................................................27

*U.S. v. Williams*,
    737 F.2d 594 (7th Cir. 1984) ......................................................................31

*X-Men Sec., Inc. v. Pataki*,
    196 F.3d 56 (2d Cir. 1999) ...................................................................1, 25, 27

*Walcyzk v. Rio*,
    496 F.3d 139 (2d Cir. 2007) ...................................................................27, 28

*White v. Wortz*,
    66 F. Supp. 2d 331 (D. Conn. 1999) ...................................................... 36-37

## **<u>Statutes:</u>**

28 U.S.C. § 1291 ....................................................................................................1

42 U.S.C. § 1983 .............................................................................................1, 25

Connecticut General Stat. § 53a-167a(a) ......................................................*Passim*

## STATEMENT OF JURISDICTION

Defendant, Michael Sorbo, ("Officer Sorbo" or "Defendant"), appeals from the District Court's (*Shea, J.*) denial of his summary judgment motion asserting qualified immunity from Plaintiff's civil rights claims under 42 U.S.C. § 1983 for false arrest and malicious prosecution in violation of the Fourth Amendment, retaliation for exercising rights guaranteed by the First Amendment, and denial of equal protection of the laws in violation of the Fourteenth Amendment. The District Court denied Officer Sorbo's summary judgment motion in its March 19, 2014 memorandum of decision, concluding "that a reasonable jury, drawing all inferences in favor of Ms. Berg, could decide that it was objectively unreasonable for Officer Sorbo to believe that probable cause existed, and that officers of reasonable competence would not disagree on whether the probable cause test was met." Joint Appendix (hereinafter "A-__" or "A-__-__"), at A-262-263. Officer Sorbo, thereafter, timely filed a Notice of Appeal from the District Court's decision on April 17, 2014. A-264.

Pursuant to 28 U.S.C. § 1291, the Court of Appeals has appellate jurisdiction over this interlocutory appeal because the denial of qualified immunity on a question of law is subject to immediate appeal. *See Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985); *X-Men Sec., Inc. v. Pataki*, 196 F.3d 56, 65 (2d Cir. 1999);

*Harhay v. Town of Ellington Bd. of Educ.*, 323 F.3d 206, 210 (2d Cir. 2003); *Savino v. City of New York*, 331 F.3d 63, 71-72 (2d Cir. 2003).

Additionally, "a district court's mere assertion that disputed factual issues exist [is insufficient] to preclude an immediate appeal." *Salim v. Proulx*, 93 F.3d 86, 89 (2d Cir. 1996). Thus, even if a court finds that material disputes of fact preclude summary judgment on qualified immunity, an interlocutory appeal is still appropriate where the defendant contests the materiality of such facts or contends that he is entitled to qualified immunity even under the plaintiffs' version of the facts. *See McColley v. County of Rensselaer*, 740 F.3d 817, 822 (2d Cir. 2014); *Cowan v. Breen*, 352 F.3d 756, 761 (2d Cir. 2003); *Tierney v. Davidson*, 133 F.3d 189, 194 (2d Cir. 1998); *O'Bert v. Vargo*, 331 F.3d 29, 38 (2d Cir. 2003); *Salim*, 93 F.3d at 90-91.   Here, as set forth below, Defendant contests the materiality of the facts found disputed by the District Court and argues that the District Court erred as a matter of law in its decision denying his motion for summary judgment on qualified immunity grounds.   As such this Court has jurisdiction over this appeal.

## STATEMENT OF THE ISSUES

I.  Did the District Court err in its application of the "corrected affidavits doctrine"?

II. Did the District Court erroneously conclude that Defendant was not entitled to qualified immunity?

## STATEMENT OF THE CASE

This lawsuit arises out of the arrest of Plaintiff pursuant to a warrant issued by Connecticut Superior Court Judge Joseph A. Licari, Jr. on September 4, 2009. The warrant authorized the arrest of Plaintiff for interfering with an officer in violation of Conn. Gen. Stat. § 53a-167a.   That criminal statute provides as follows:

> A person is guilty of interfering with an officer when such person *obstructs, resists, hinders* or endangers any peace officer . . . in the performance of such peace officer's . . . duties.

Conn. Gen. Stat. § 53a-167a(a) (emphasis added).

As found by the District Court, the facts giving rise to the arrest occurred on July 19, 2009 when Plaintiff, along with the then mayor of East Haven April Capone ("Mayor Capone"), interacted with East Haven Police Officer Michael Sorbo, a tow truck operator named John Conway ("Conway"), and a number of persons who were upset that Officer Sorbo had ordered that their cars be towed

from a parking lot (the "subject parking lot") located at the corner of Bradford Avenue and Coe Avenue near the beach in East Haven, Connecticut.

## I.   *THE ALLEGATIONS OF PLAINTIFF'S COMPLAINT*

In addition to Officer Sorbo, Plaintiff's operative Complaint named as defendants the Town of East Haven (the "Town"); the Town's Chief of Police, Leonard Gallo; five other named Town police officers; and "unknown John Doe Officers."  A-13.   Plaintiff also named as a defendant, Joseph Maturo, an individual who was a private citizen at the time of Plaintiff's arrest.  Id. Mr. Maturo is currently the Mayor of the Town.

Plaintiff's Complaint alleges that she brought this action "to redress a conspiracy by the defendants the object of which was to utterly deprive [her] of her civil rights." A-13-14, ¶ 1. The alleged purpose of the conspiracy was to punish Plaintiff "for her political affiliations and beliefs, and at the same time to further the defendants own political aspirations and designs to control" the Town. Id.

Plaintiff alleges that "during all times mentioned in the complaint" her "boss" was, Mayor Capone, the mayor of East Haven and that the defendant Maturo "was either a high ranking member of the Republican Party of East Haven or mayor of East Haven who opposed Ms. Capone." A-15-16, ¶ 10. According to the complaint, the individual defendants "were aware that the plaintiff was a Democratic party member working for Mayor Capone, a political opponent of

4

Defendant Maturo and that the defendants supported Maturo and wished to curry his favor, as Gallo and Maturo had a long-standing relationship going back more than a decade." A-16-17, ¶ 15. Plaintiff alleges that the defendants conspired to implement a plan to falsely arrest her, "in order to foster Maturo's political ambitions and exact revenge for some undisclosed perceived slight" following Capone's election in 2007. Id.

The facts alleged in the Complaint to support this conspiracy were that on or about July 19, 2009, Officer Sorbo – in concert with the other defendants - swore a false complaint in order to procure a warrant for Plaintiff's arrest. A-17, ¶ 16. The application prepared by Sorbo alleged that Plaintiff and Capone had interfered with his performance of his official police duties. Plaintiff alleges that in the affidavit supporting the application for her arrest warrant, Officer Sorbo falsely accused her of removing tickets he had placed on cars that were parked at a town beach that he had authorized to be towed. A-17, ¶ 16. Plaintiff alleges that "given the known falsehood of Sorbo's complaint, there was no probable cause to arrest the plaintiff for any criminal act." A-19, ¶ 26.

According to Plaintiff's Complaint, the arrest warrant was signed by a Superior Court Judge on August 31, 2009 and Plaintiff learned of its existence, was advised to turn herself in to the East Haven Police department on September 4,

2009, and she did. A-18, ¶ 21. The charges were eventually dismissed by the Hon. Earl Richards on February 22, 2010. A-19, ¶ 27.

Based on these allegations Plaintiff alleged that the defendants violated her rights under Fourth, Fifth and Fourteenth Amendment to the United States Constitution, and her right to equal protection. She further asserted claims under the Connecticut common law for false imprisonment, malicious prosecution, defamation and intentional infliction of emotional distress. A-21-23, ¶¶ 38-45.

The defendants answered the Complaint and asserted affirmative defenses. A-25-31. Relevant to this appeal, Officer Sorbo asserted as an affirmative defense that Plaintiff's civil rights claims against him were barred by the doctrine of qualified immunity. A-29.

## II. *OFFICER SORBO'S MOTION FOR SUMMARY JUDGMENT*

On August 23, 2013, Officer Sorbo, along with the other defendants, moved for summary judgment.[1] A-32. In support of their motion for summary judgment the defendants submitted the deposition transcripts of Plaintiff and Officer Sorbo,

---

[1] Plaintiff withdrew her claims against defendants Emerman, Finoia, Kattis, and Montagna on October 7, 2013. A-10, #54. Additionally, after March 11, 2014 oral arguments on defendants' summary judgment motion, the District Court granted summary judgment to defendants Miller, Gallo and Maturo "for, among other things, lack of personal involvement in the alleged deprivation of Ms. Berg's rights, and to the Town of East Haven, because Ms. Berg had failed to show a municipal custom or policy sufficient to prove a *Monell* claim." A-250 n.1. Finally, "[w]ith Ms. Berg's consent, her claims against the John Doe officers were dismissed." Id. Thus, Officer Sorbo was the only remaining defendant in the action when the District Court issued its memorandum of decision.

the police report, and the arrest warrant application as attachments to their Local Rule 56(a)(1) statement. A-35. Finally, the defendants also submitted the affidavit of John Conway, a tow truck driver that Officer Sorbo interviewed in connection with his investigation of Plaintiff's conduct that led to her arrest. A-182-185. The facts established by this record relating to Plaintiff's claims against Officer Sorbo at issue in this appeal are set forth below.

### III.    *THE EVENTS OF JULY 19, 2009*

The events underlying this case involve Officer Sorbo's actions and orders to address a public safety issue by towing cars which had blocked the entrance and exit of a beach parking lot in East Haven, Connecticut on July 19, 2009; Plaintiff's interference with that plan; and Plaintiff's subsequent arrest for interfering with an officer.

Mayor Capone was elected mayor of East Haven in November 2007. A-35, 201. At her deposition, Plaintiff testified that she had worked on her campaign staff.  Id. A few months after Mayor Capone was elected Plaintiff became employed as a "confidential assistant in the office of the mayor." A-35-36, 201. During Plaintiff's employ in the mayor's office she was responsible for initiating a farmers' market that operated in East Haven on Sundays in the summer.  Plaintiff attended that market each Sunday in the summer. Id.

On Sunday, July 19, 2009 Plaintiff and Mayor Capone went together in Plaintiff's car to the farmers market. A-36, 201. Around noon that day, as the farmers market was closing, the plaintiff and Mayor Capone decided to drive to the Sandpiper Restaurant in East Haven. Id.  Plaintiff admitted that the decision to go to the Sandpiper was not preplanned and there was no way that Officer Sorbo, or any of the other defendants, could have known that she and the Mayor were going to arrive there that day. Id.

Officer Sorbo was assigned to beach patrol duty on July 19, 2009. A-42, 204. This assignment required him to, among other things, manage a public parking lot that was near the beach and next to a parking lot for the "Sandpiper" restaurant. Id. "Due to limited parking availability, cars began to park in the public parking lot in a haphazard manner, eventually blocking the entrance and exit to the lot." A-251. Citizens complained to Officer Sorbo that their cars were being blocked in. A-43, 204, 251. Those citizens also expressed concern that some vehicles were instead choosing to exit the lot by driving over an adjacent playground and sidewalk where children were playing. A-43, 204-205, 251.

After assessing the situation, Officer Sorbo determined that a public safety issue existed which needed to be addressed immediately. A-43, 205, 251. Officer Sorbo ticketed six vehicles which were blocking the exits and called the East Haven police station to request tow trucks to remove those ticketed vehicles. A-43-

44, 205, 251. Multiple tow trucks then arrived at the parking lot and began towing the vehicles. Id.

Plaintiff agrees that when she and Mayor Capone arrived at the parking lot cars were parked in a "haphazard" manner, and she described the scene as "chaotic." A-75, 112, 252. Plaintiff testified that she and Mayor Capone agreed that it was a good idea to move the troublesome vehicles to allow other vehicles to exit, but that both disagreed with Officer Sorbo's decision to have the cars towed. A-37, 201, 252.

After arriving at the parking lot, Plaintiff and Mayor Capone exited Plaintiff's vehicle and spoke with families in the parking lot who were distressed that their vehicles were being towed. A-37, 201, 252. The families also informed the two that Officer Sorbo was down at the beach where the police substation was located. A-37, 201. Mayor Capone went towards the beach to locate Officer Sorbo and Plaintiff approached a tow truck operator, John Conway ("Conway"),[2] who had a car on his tow truck, about to be towed out of the lot pursuant to Officer Sorbo's instructions. A-37-38, 201, 252. Plaintiff testified that she then instructed Conway "not to leave the area with the car that he had in tow because the people

---

[2] John *Conway* is incorrectly identified in the arrest warrant as John *Connolley*. *See, e.g.,* A-198. That misnomer also continued in the deposition transcripts. Mr. Conway's affidavit establishes that he was the tow truck operator that Ms. Berg admits she spoke to that day and was subsequently interviewed by Officer Sorbo. A-183-86. *See, e.g.*, A-260 (the District Court correcting 'Connolley' to 'Conway').

9

that owned the vehicle were right there." A-38, 86-87. In response to this discussion with Plaintiff, Conway did not tow the car out of the subject parking lot but rather waited for Mayor Capone to return from the beach. A-38, 77. Indeed, Mr. Conway swore that he waited "approximately five to ten minutes" for Mayor Capone to arrive at Ms. Berg's request.[3] A-185. He also swore that by following Ms. Berg's instructions, he "was not complying with the lawful instructions of [Officer Sorbo]." Id. Officer Sorbo observed Plaintiff talking with Mr. Conway, although did not hear the conversation. A-44-45, 205, 252.

A few minutes later, Mayor Capone returned from the beach and proceeded to make phone calls to her office and to the East Haven police dispatch officer Sergeant Kattis. A-38, 202. Plaintiff admits that she heard the Mayor yelling at a police officer at the beach. Id. Plaintiff also confirmed that Mayor Capone told Sergeant Kattis in a phone conversation that day "[w]hy is Officer Sorbo towing cars" and also said "I'll tell you and I'll have a talk with the Chief, but I have fucking had it with Officer Sorbo playing cute down here at the beach, I've had it

---

[3] Mr. Conway's affidavit made in support of the Motion for Summary Judgment also noted that he received a phone call on the evening of July 19, 2009 from Officer Sorbo, who was investigating the conduct of Ms. Berg and Mayor Capone. Mr. Conway swears that he told Officer Sorbo the same information which he described in his affidavit on that night. The Court recognized that Ms. Berg did not, and indeed could not, present any evidence as to what Mr. Conway had told Officer Sorbo about the Berg-Conway conversation. A-260. Thus, it is undisputed that Officer Sorbo had the information described in Mr. Conway's affidavit at his disposal as of the evening of the incident.

dealing with this shit on a Saturday." Id. Officer Sorbo testified that Mayor Capone confronted him and said to him several times "this is political; just say it; just say yes ma'am; just say it." Id. He decided to walk away and not arrest Mayor Capone because, as he explained, "I would have more of a problem if I had done that. I would have caused a lot of problems with the people, and I chose not to take action and handle the situation I was working on at the time." A-44.

After Plaintiff spoke with Mr. Conway, the tow truck operator, Mayor Capone approached Conway. A-46, 206. Mr. Conway also informed Mayor Capone that he felt obligated to follow Officer Sorbo's instructions to tow the vehicle that he had on the back of his tow truck. Id. Mayor Capone asked Conway to phone his supervisor so she could speak to him, which he did. Id. After speaking to Mayor Capone his supervisor instructed Mr. Conway to drop the vehicle he was towing. Mr. Conway dropped the vehicle and left the scene. Id.

Plaintiff readily admitted several times during her deposition that she and the Mayor disagreed with Officer Sorbo's decision to tow cars from the parking lot and that their intent that day was to stop his orders to tow vehicles from happening. A-40, 92-93, 112-13.

For example, Plaintiff admitted that it was clear upon arriving at the subject parking lot that cars needed to be removed to allow ingress and egress from the parking lot and that the scene was "chaotic". A-36, 75-76, 201. Nonetheless,

11

Plaintiff testified that she felt authorized to instruct Mr. Conway to "drop" the car because she knew that "in the State of Connecticut, even if they had offered to pay the drop fee, he's required to pay the drop fee – he's required to pay – he's required to drop the car." A-40, 87-88. Asked why she didn't call the police and instead decided to instruct a tow truck operator to drop the car he was towing, she testified "I knew the mayor was on the phone and she was handling it from that end and I felt like at that point it was best for me – I have a social work background. I was trying to diffuse the situation, as an officer should have been doing that day." A-40, 76-77. Plaintiff admitted that she understood that trying to placate people who were upset because their cars were being towed at the direction of a police officer was not within her "job description" as a confidential assistant to the Mayor. A-41, 77, 203.

Plaintiff further testified that she disagreed with Officer Sorbo's decision to call tow trucks because, in her opinion, "a police officer's primary duty is to make sure that, you know, the public is kind of calm and there's no disruption of anything. And I think there were other actions the officer could have done that day, perhaps – there was a DJ down there with a microphone and the beach is an eighth of an acre, he could have yelled and said, 'Cars are being towed, you might be blocking somebody.'" A-41, 76, 203.

Ultimately, Plaintiff and Mayor Capone were *successful* in preventing the due execution of Officer Sorbo's order. A-41. Mr. Conway stopped his towing, given Plaintiff's conduct, until the Mayor arrived. Then, after the Mayor spoke with his supervisor, he left entirely. Plaintiff confirmed at her deposition that the two had stopped at least some of the towing, as illustrated by the following testimony:

> Q.   So who would have known that [the Mayor's] was going down to the beach that day after the Farmer's Market?
>
> A.   Whether or not we were present or not, this still would have   happened.   And believe it or not, *if we weren't present when it happened, Monday morning would have been a bigger nightmare* because there would have been the four cars that were towed, the three that were going to be towed while we were there and how many cars would have been towed if we weren't present *to have stopped the nonsense* that was happening that day.

B 64-65 (emphasis added). *See* A-41, 203 (admitting that she felt Officer Sorbo's conduct was "nonsense").

## IV.   *OFFICER SORBO'S INVESTIGATION AND SUBSEQUENT ARREST OF PLAINTIFF*

After completing his shift on July 19, 2009, Officer Sorbo further investigated Plaintiff and Mayor Capone's conduct in connection with preparing an application for an arrest warrant. A-44. Officer Sorbo did not hear the conversation between Conway and Plaintiff that he had observed take place in the subject parking lot. A-45, 205. Accordingly, Officer Sorbo interviewed Conway by phone

on the evening of July 19th and elicited further information from him, a trustworthy third party witness, as to Plaintiff's conduct that day. A-45. *See* A-260 (the District Court finding that Plaintiff had no personal knowledge of the Sorbo-Conway conversation and therefore submitted no evidence as to what Conway told Sorbo).

In that interview, Conway told Officer Sorbo that during the conversation between himself and Plaintiff in the parking lot, Plaintiff had asked him to put the car that he was towing down. A-45, 184-85. In response, Conway informed Plaintiff that he had been ordered to tow the car by a police officer and that therefore he believed he had a legal duty to obey that order. Id.

Conway also told Officer Sorbo that after he told Plaintiff that he was under a legal duty to tow the car because of Sorbo's instructions, Plaintiff "instructed" Conway not leave the parking lot with the car because Mayor Capone was on her way to the parking lot to "deal with this situation." A-45-46, 184-85.

Conway also informed Officer Sorbo that in response to Plaintiff's instructions, he waited in the subject parking lot for Mayor Capone for five to ten minutes. A-45-46, 184-85. Moreover, Conway was concerned that while he waited he was not complying with Officer Sorbo's lawful instructions to complete towing cars from the parking lot to make the situation safer. Id. Conway also swore that Mayor Capone then approached him and repeated Plaintiff's request to drop the vehicle. A-46, 184-85.

14

Conway also told Officer Sorbo that he then told Mayor Capone that he felt obligated to follow the instructions of the police officer and finish towing the car. A-46, 184-85. Mayor Capone then asked Conway to call his supervisor so that she could speak to him, he called his supervisor, and handed the phone to Mayor Capone. Id. Finally, Conway informed Officer Sorbo that Mayor Capone spoke to his supervisor and she handed the phone back to him. Id. His supervisor instructed him to drop the car that he was towing and to leave the parking lot. Id. He complied with his supervisor's order, dropped the vehicle, and left the parking lot. Id.

On July 22, 2009, Officer Sorbo prepared a case incident report, memorializing the events that occurred in the subject parking lot along with his interviews with John Conway and another tow truck operator, Michael Sarno. A-46, 206. After preparing this case incident report, Officer Sorbo decided while he was on vacation that he would pursue a warrant for the arrest of Plaintiff for interfering with a police officer. A-47.

After returning from vacation, he made a media request of Sergeant Kattis and Chief Gallo to listen to two East Haven Police dispatch audio tapes of conversations that occurred on July 19, 2009. A-47, 206. The first conversation was between Mayor Capone and the dispatch officer, Sergeant Kattis, as discussed above. Id. The second tape was a separate phone call made later that day to the

15

East Haven Police dispatch, on which can be heard a conversation between Officer Sorbo and Mayor Capone in which Mayor Capone tells Officer Sorbo "I'm turning you into the chief" and "this is political just say yes ma'am, say it." Id.

Officer Sorbo prepared and signed a five page affidavit in support of an arrest warrant application for the Plaintiff and Mayor's arrest on August 31, 2009. A-46-47, 206-07. On September 2, 2009, Officer Sorbo met with State's Attorney Michael Dearington, discussed the events of July 19, toured the subject parking lot with Mr. Dearington, and provided Mr. Dearington a video that he had taken on July 19, 2009 which depicted tire tracks going over a children's play area adjacent to the subject parking lot. Id. Officer Sorbo then prepared a supplemental report describing these events. Id.

The arrest application was signed by State's Attorney Michael Dearington on September 3, 2009, submitted to the Superior Court and granted by Superior Court Judge Joseph A., Licari, Jr. on September 4, 2009. A-46-47, 206-07. Plaintiff and Mayor Capone were both arrested for "interfering with an officer" in violation of Conn. Gen. Stat. § 53a-167a. However, the State did not pursue the charges and they were eventually dropped. A-253. Finally, Plaintiff brought the present action, as described above. A-14.

## V.    *THE DISTRICT COURT OPINION*

On March 19, 2014, the District Court granted in part and denied in part Defendant Sorbo's motion for summary judgment. A-250-263. Specifically, the District Court granted summary judgment as to any conspiracy claim as Plaintiff had submitted no admissible evidence to support that claim, but denied it as to all other claims. A-263.

The District Court reviewed Connecticut precedent on Conn. Gen. Stat. § 53a-167a: the "interfering with an officer" statute under which Plaintiff was arrested. A-253-55. The District Court then applied the "corrected affidavits doctrine" to Officer Sorbo's arrest warrant affidavit. A-257-60. The District Court denied summary judgment as it held that "a reasonable jury, drawing all inferences in favor of Ms. Berg, could decide that it was objectively unreasonable for Officer Sorbo to believe that probable cause existed, and that officers of reasonable competence would not disagree on whether the probable cause test was met." A-262-63. The District Court concluded that a reasonable jury could find that Ms. Berg's conduct was "innocuous" and amounted to less than even questioning an officer's authority or protesting the officer's actions, both of which it found were allowable under the Connecticut Supreme Court's interpretation of the interference statute. Id.

17

The District Court found that it was undisputed that "Officer Sorbo determined that a public safety issue existed that needed to be addressed immediately." A-251. Moreover, the District Court noted that Plaintiff "agreed that the vehicles obstructing the exit needed to be move" but merely disagreed with the means Officer Sorbo used. A-252.

As an initial matter, the District Court found that Plaintiff had provided sufficient evidence of potential animus to, at the summary judgment stage, move on to the "corrected affidavits doctrine" and qualified immunity analysis. A-257-58. The District Court therefore attempted to "disregard the 'allegedly false material' and 'supply any omitted information' to determine the content of the hypothetical corrected affidavit." Id.

The District Court noted that the arrest warrant affidavit identified three acts by Ms. Berg which could violate the interference statute and therefore provide arguable probable cause for her arrest. A-258. First, the affidavit alleges that Ms. Berg removed tickets from vehicles and took tickets from other individuals who arrived. Id. Second, it alleges that Officer Sorbo learned through a conversation with the tow truck driver Mr. Conway that Ms. Berg had told Mr. Conway "not to leave the parking lot with the vehicle he had in tow because the mayor was 'on her way there.'" Id. Third, it alleges that after a woman spoke with Officer Sorbo about a ticket, Ms. Berg spoke with the woman, took the ticket, and the two left the

18

beach together. A-258-59. The District Court found that there were factual disputes over the so-called first and third acts, so ignored them under the corrected affidavits doctrine. A-259-60. Those "corrections" are not at issue here.

The arrest warrant affidavit did somewhat describe what Officer Sorbo had learned from Conway. A-198-99. However, the District Court was also provided with Mr. Conway's affidavit, swearing to what he had told Officer Sorbo on the evening of July 19, 2009. A-185 ("Later that night I received a phone call from . . . Officer Sorbo . . . I informed Officer Sorbo of the facts set forth in paragraphs 1 through 14 above."). The District Court recognized that the Conway affidavit was important, stating that its description of the Berg-Conway conversation "is more detailed and more suggestive of interference." A-261.

The District Court also recognized that:

> Although Ms. Berg disputes the version of her conversation with the tow truck driver set forth in the affidavit, *she has not submitted any evidence* that Officer Sorbo's report was false. *Nor could she. . . There is no evidence in the record that Ms. Berg had any personal knowledge of what Mr. Conway told Officer Sorbo* about the conversation that took place between her and Mr. Conway.

A-260 (emphasis added). Thus, while Ms. Berg disputed whether she said what Mr. Conway swore that she had said to him, she presented *no evidence* to dispute that Mr. Conway told Officer Sorbo the version of the Berg-Conway conversation

19

memorialized in the Conway affidavit on the evening of July 19, 2009 during Sorbo's investigation which led to Ms. Berg's arrest.

Although there was undisputed evidence that Mr. Conway had relayed the information contained in his affidavit to Defendant on the evening of July 19, 2009, the District Court did not consider it in its qualified immunity analysis. The District Court made this decision because Plaintiff claimed that her conversation with Mr. Conway had gone differently, and it held that it had to credit Ms. Berg's version at this stage of the case. A-261-62 ("I am required to resolve this discrepancy in favor of Ms. Berg, crediting the shorter, murkier version of the conversation included in the arrest warrant affidavit.").

The District Court's refusal to consider the Conway affidavit affected its ruling denying summary judgment, as the District Court raised at least one question which the Conway affidavit answered. Compare, e.g., A-261 ("It is also unclear whether the mayor arrived at Mr. Conway's truck within seconds of Ms. Berg's request, or whether Mr. Conway's delay in leaving the parking lot as a result of Ms. Berg's request stretched into minutes, or longer.") with, A-185 ("I complied with Erica Berg's request *and for approximately five to ten minutes* I waited in the parking lot and did not tow the car out of the parking lot" and "*[a]fter*

*approximately five to ten minutes after* having this conversation with Erica Berg . . .” the mayor arrived) (emphasis added).[4]

The District Court, looking only at the information contained in the arrest warrant affidavit and resolving factual disputes in Plaintiff's favor, found that “the evidence would be that Ms. Berg simply asked Mr. Conway, who was already stopped, if he would not mind holding off towing the car for a brief period until the mayor could speak with him.” A-262. The District Court found that this conduct fell outside of what the interference statute covered and therefore held that, at least at the summary judgment stage, Officer Sorbo was not entitled to qualified immunity. A-262-63. The District Court therefore denied his Motion for Summary Judgment. A-263. The District Court also denied summary judgment over the state law claims as the argument there was similarly based on the existence of probable cause. Id.

Defendant then timely filed his Notice of Appeal on April 17, 2014. A-264.

---

[4] Defendant notes that even the arrest warrant affidavit states that “a few minutes” went by before the Mayor arrived. A-198. Moreover, the District Court's question regarding the length of the delay which Ms. Berg's conduct caused belies a misunderstanding of 53a-167a precedent. A delay need not be “substantial” to violate the statute. *State v. Aloi*, 280 Conn. 824, 843-44 (2007). Instead, the delay merely has to be of an “appreciable degree”, that is, it must be “noticeable.” *Id.*; *State v. Williams*, 110 Conn. App. 778, 794 n.8 (2008) [*Williams II*].

## SUMMARY OF THE ARGUMENT

The District Court erred in its application of the "corrected affidavits doctrine", such that it did not consider all information that was undisputedly known to Defendant at the time he made the affidavit. The District Court further erred in its application of Connecticut case law interpreting Conn. Gen. Stat. § 53a-167a when it determined that Officer Sorbo lacked arguable probable cause for Plaintiff's arrest and that he therefore was not entitled to qualified immunity.

The corrected affidavits doctrine removes allegedly false material from an affidavit, adds in omitted information, and ultimately seeks to create a "corrected" affidavit that reflects all the information known to the applicant at the time of its making. Although Ms. Berg disagrees with Mr. Conway on the details of the Berg-Conway conversation, it is *undisputed* that Mr. Conway told Officer Sorbo *his* version, memorialized in the Conway affidavit, on the evening of July 19, 2009. Therefore, the District Court should have included the Conway affidavit as part of the "corrected" affidavit, as it presents information that Officer Sorbo undisputedly had by the time he made the arrest warrant affidavit.

The District Court further erred as Officer Sorbo's arrest warrant affidavit contains at least arguable probable cause for Plaintiff's arrest. This is especially true once this court considers the contents of the Conway affidavit, as argued above, but is also true even when looking only at the facts which the District Court

found to be undisputed. Connecticut precedent establishes that conduct such as Plaintiff's—disrupting an ongoing police traffic control plan that was created to deal with an immediate public safety issue—is sufficient to support a *conviction* under the interference statute. Officer Sorbo therefore certainly had arguable probable cause for Plaintiff's arrest, and should be granted qualified immunity.

For the foregoing reasons, the District Court ruling should be reversed and judgment should enter in favor of the Defendant.

## LAW AND ARGUMENT

### I.    *STANDARD OF REVIEW*

The Court of Appeals reviews a District Court's grant or denial of summary judgment *de novo*, construing the evidence in the light most favorable to the non-moving part. *See, e.g., Tenenbaum v. Williams*, 193 F.3d 581, 592 (2d Cir. 1999); *Coollick v. Hughes*, 699 F.3d 211, 219 (2d Cir. 2012). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issues as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "The substantive law governing the case will identify those facts that are

23

material, and 'only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" *Bouboulis v. Transp. Workers Union of Am.*, 442 F.3d 55, 59 (2d Cir. 2006) (quoting *Anderson*, 477 U.S. at 248).

The moving party bears the burden of demonstrating the absence of a genuine issue as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986). In determining whether a material issue of fact exists, the court must resolve all ambiguities and draw all inferences against the moving party. *See Anderson*, 477 U.S. at 256. The party opposing summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256. Thus, once the moving party has satisfied its burden of identifying the evidence which demonstrates the absence of a genuine issue of material fact, the non-moving party is required to go beyond the pleadings by way of affidavits, depositions, and answers to interrogatories in order to demonstrate specific material facts which give rise to a genuine issue. *See Celotex*, 477 U.S. at 324. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matasushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

24

"Qualified immunity is an entitlement not to stand trial or face the other burdens of litigation. [It] is an immunity from suit rather than a mere defense to liability . . ." *Saucier v. Katz*, 533 U.S. 194, 200-01 (2001) (internal citations and quotation marks omitted). Accordingly, the denial of summary judgment on a claim of qualified immunity is subject to an immediate appeal to the extent that the district court's denial turns on a question of law. *See Behrens v. Pelletier*, 516 U.S. 299, 313 (1996); *Mitchell*, 472 U.S. at 530; *X-Men*, 196 F.3d at 56.

"[I]n the absence of a material factual dispute, the question of whether it was objectively reasonable for the officers to believe that they did not violate the plaintiff's rights is a purely legal determination for the court to make." *Lennon v. Miller*, 66 F.3d 416, 422 (2d Cir. 1995). As such, this Court's standard of review of the District Court's decision is plenary. *Id.*

## II. *QUALIFIED IMMUNITY*

Qualified immunity shields officials from suits for damages under 42 U.S.C. § 1983 unless their actions violate clearly established rights of which an objectively reasonable official would have known. *See Pearson v. Callahan*, 555 U.S. 223, 231 (2009); *Harlow v. Fitzgerald*, 457 U.S. 800, 813 (1982); *Thomas v. Roach*, 165 F.3d 137, 142 (2d Cir. 1999); *Ricciuti v. N.Y.C. Transit Authority*, 124 F.3d 123, 127 (2d Cir. 1997). "The protection of qualified immunity applies regardless of whether the government official's error is a mistake of law, a mistake

of fact, or a mistake based on mixed questions of law and fact." *Pearson*, 555 U.S. at 231 (internal quotations omitted). Indeed, "[q]ualified immunity gives governmental officials breathing room to make reasonable but mistake judgments, and protects all but the plainly incompetent or those who knowingly violate the law." *Messerschmidt v. Millender*, 132 S. Ct. 1235, 1244-45 (2012) (internal quotations omitted).

The question of whether an officer is protected by qualified immunity for an allegedly unlawful action turns on the objective legal reasonableness of the action at issue, assessed in the light of the legal rules which were clearly established at the time of the incident. *Messerschmidt*, 132 S. Ct. at 1245. A neutral magistrate's issuance of a warrant "is the clearest indication that the officers acted in an objectively reasonable manner". *Id.* That "shield of immunity" can "be lost, for example, where the warrant was based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Id.* (internal citations omitted). "[H]owever, . . . the threshold for establishing this exception is a high one, and it should be." *Id.* "[I]t goes without saying that where a magistrate acts mistakenly in issuing a warrant but within the range of professional competence of a magistrate, the officer who requested the warrant cannot be held liable." *Malley v. Briggs*, 475 U.S. 335, 346 n.9 (1986).

26

Therefore, even when a plaintiff's constitutional rights were clearly established, the qualified immunity defense will protect a defendant "if it was objectively reasonable for him to believe that his action was lawful at the time of the challenged act." *Lennon*, 66 F.3d at 420. *See Harhay*, 323 F.3d at 211; *X-Men*, 196 F.3d at 66. "Even if the right at issue was clearly established in certain respects . . . an officer is still entitled to qualified immunity if officers of reasonable competence could disagree on the legality of the action at issue *in its particular factual context*." *Walcyzk v. Rio*, 496 F.3d 139, 154 (2d Cir. 2007) (emphasis added). The officer's action is therefore deemed objectively reasonable "if officers of reasonable competence could disagree on the legality of the defendant's actions." *Lennon*, 66 F.3d at 420; *Walcyzk*, 496 F.3d at 154. This is known as "arguable probable cause". *See, e.g., Walcyzk*, 496 F.3d at 163.

Finally, "a court must examine the *totality of the circumstances* of a given arrest" in determining whether probable cause exists. *U.S. v. Delossantos*, 536 F.3d 155 (2d Cir. 2008) (emphasis added). *See, e.g., Caldarola v. Calabrese*, 298 F.3d 156, 162 (2d Cir. 2002); *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006); *Walcyzk*, 496 F.3d at 156. Thus, "[t]o determine whether an officer had probable cause to arrest an individual, we examine the events leading up to the arrest, and then decide whether these historical facts, viewed from the standpoint of an

objectively reasonable police officer, amount to probable cause." *Maryland v. Pringle*, 540 U.S. 366, 371 (2003)

## III.  *THE DISTRICT COURT ERRED IN ITS APPLICATION OF THE CORRECTED AFFIDAVITS DOCTRINE*

### A.    The Corrected Affidavits Doctrine

"Ordinarily, an arrest or search pursuant to a warrant issued by a neutral magistrate is presumed reasonable because such warrants may issue only upon a showing of probable cause." *Walcyzk*, 496 F.3d at 155-56. A plaintiff may rebut this presumption by demonstrating that "the officer submitting the probable cause affidavit knowingly and intentionally, or with reckless disregard for the truth, made a false statement in his affidavit or omitted material information, and that such false or omitted information was necessary to the finding of probable cause." *Soares v. Connecticut*, 8 F.3d 917, 920 (2d Cir. 1993) (internal citations omitted).

"It has long been recognized that, where there is no dispute as to what facts were relied on to demonstrate probable cause, the existence of probable cause is a question of law for the court." *Walcyzk*, 496 F.3d at 157 (citing *Stewart v. Sonneborn*, 98 U.S. 187, 194 (1878)). Whether an arrest warrant affidavit demonstrates probable cause is a question of law for the Court. *Id.*

A claim that an arrest warrant contained false statements or omitted material information may trigger the corrected affidavits doctrine. *Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004). As the *Escalera* court described it:

28

Under this doctrine, we look to the hypothetical contents of a 'corrected' application to determine whether a proper warrant application, *based on existing facts known to the applicant*, would still have been sufficient to support arguable probable cause to make the arrest as a matter of law.

In performing this correcting process, *we examine all of the information the officers possessed* when they applied for the arrest warrant. If there remains an objective basis to support arguable probable cause, remaining factual disputes are not material to the issue of qualified immunity and summary judgment should be granted to the defendant on the basis of qualified immunity. Only if the corrected affidavit would not support a reasonable officer's belief that probable cause existed would the identified factual disputes be material to resolving the issue.

*Id.* at 744 (emphasis added) (internal citations and quotations omitted). *See Soares*, 8 F.3d at 920 ("a court should put aside allegedly false material, *supply any omitted information*, and then determine whether the contents of the 'corrected affidavit' would have supported a finding of probable cause.") (emphasis added).

A well-established and central piece of the corrected affidavits doctrine is that a court "examine[s] *all of the information the officers possessed* when the applied for the arrest warrant." *Escalera*, 361 F.3d at 744 ("The issue under the corrected affidavit analysis is whether, *if [defendant] had included all [he] learned from [his] investigation*, the application would have supported a reasonable officer's [or magistrate's] belief that probable cause existed.") (emphasis added) (internal citation omitted). *See, e.g., Martinez v. City of Schenectady*, 115 F.3d 111,

115 (2d Cir. 1997) ("The 'corrected affidavits' doctrine, therefore, requires us to examine *all the information the officers actually possessed* when they applied for the search warrant.") (emphasis added); *Miles v. City of Hartford*, 719 F. Supp. 2d 207, 219 (D. Conn. 2010) ("Under this doctrine, the Court must construct what a hypothetical, 'corrected' warrant application would contain, based on the facts *as they were known to the applicant . . .*") (emphasis added); *cf. Anderson v. Creighton,* 483 U.S. 635, 641 (1987) ("the determination [of] whether [an action] was objectively legally reasonable . . . will often require examination of the information possessed by the searching officials."); *Lowth v. Town of Cheektowaga*, 82 F.3d 563, 569 (2d Cir. 1996) ("Courts evaluating probable cause for an arrest must consider those facts available to the officer at the time of the arrest and immediately before it.").

As such, the doctrine requires not just "correcting for material misstatements" by removing them, but also requires correcting "omissions" by *adding* information known to the applicant at the time to the corrected affidavit. *See, e.g., Magnotti v. Kuntz*, 918 F.2d 364, 368 (2d Cir. 1990); *Smith v. Edwards*, 175 F.3d 99, 105 (2d Cir. 1999) ("The first step in assessing the materiality of such an omission is to 'correct' the allegedly defective affidavit by inserting the information withheld from the magistrate judge.").

While the rule regarding omissions is often used to add *exculpatory* information to an affidavit where it was left out, the Second Circuit has recognized that courts must also add "*inculpatory* evidence omitted from the affidavits." *Cournoyer v. Coleman*, 297 Fed. App'x 17, 18 (2d Cir. 2008) (emphasis in original).[5] *Cf. U.S. v. Williams*, 737 F.2d 594, 604 (7th Cir. 1984) ("It is further plain that if the challenger is permitted to marshal all exculpatory facts, fairness dictates that the government be allowed to support the affidavit with additional inculpatory information known to the affiant at the time the affidavit was made."). Thus, where omitted information was "known to the applicant" at the time of his warrant application it should be considered in the Court's use of the corrected affidavit doctrine, *Escalera*, 361 F.3d at 743-44, regardless of whether that information was exculpatory or inculpatory. *Cournoyer*, 297 Fed. App'x at 19 (affirming that qualified immunity would exist after the addition of inculpatory information to the subject affidavit "because the information available to defendants at the time the affidavits were drafted was sufficient to support arguable probable cause").

---

[5] Although *Cournoyer* was a summary order, it was issued on October 14, 2008 and therefore may be cited pursuant to Second Circuit rules. U.S. Ct. of App. 2nd Cir. Rule 32.1.1(b)(1) ("In a document filed with this court, a party may cite a summary order issued on or after January 1, 2007.").

**B.    The District Court Erred In Its Application Of This Doctrine By Not Considering Conway's Affidavit In The Corrected Affidavit**

The arrest warrant affidavit states that Sorbo "observed . . . Eric Berg . . . stop one (1) of the tow truck drivers, known to me as John Con[way]. As [Sorbo] was trying to clear another blocked vehicle, a few minutes elapsed." A-198. It then discusses Mayor Capone's actions at length. A-198-99. Officer Sorbo also swore in the affidavit that he spoke with Conway (and another tow truck operator, Michael Sarno) to ascertain the details of their conversations with Berg and Mayor Capone that day. A-199. "Mr. [Conway] stated, that he was first approached by Erica Berg, prior to the Mayor's arrival. She asked him not to leave the area with the vehicle that he had in tow because the Mayor was on her way there." Id. The affidavit also states that the Mayor then arrived; that she asked Conway not to tow the vehicles; and that she spoke with Conway's supervisor, also asking *him* to stop the towing.[6] Id.

Mr. Conway's affidavit is consistent with the arrest warrant affidavit but provides more detail as to the facts known to Officer Sorbo concerning Plaintiff's

---

[6] The involvement of Mayor Capone is relevant when considering the "totality of the facts" to evaluate the objective reasonableness of Defendant's actions. Even the District Court recognized the practical reality that an application for an arrest warrant for a mayor would place more focus on the mayor's actions. A-261, n.4 ("The brevity of Officer Sorbo's description of Ms. Berg's [conduct] . . . is understandable. Not surprisingly, the affidavit focuses on the conduct of Mayor Capone Almon . . .").

conduct that led to his decision to seek Plaintiff's arrest. Specifically, Mr. Conway

informed Officer Sorbo that:

> 9.    I started to tow a second or third car from the parking lot, and while that car was elevated on my tow truck but before I had towed it out of the parking lot, I was approached by Erica Berg, who I knew at that time worked for the then Mayor of East Haven April Capone-Almon.
>
> 10.    Erica Berg asked me to put the car that I was towing down and I said to her "with all due respect *the man with the badge and the gun has asked me to tow the car and I therefore believe I have a legal duty to do what the police officer instructs me to do.*"
>
> 11.    Erica Berg then *instructed* me to not leave the parking lot with the car that I was towing because the Mayor of East Haven was on her way to the parking lot and the Mayor was going to deal with this situation.
>
> 12.    I complied with Erica Berg's request *and for approximately five to ten minutes I waited in the parking lot and did not tow the car out of the parking lot*. I was concerned during the period that I was waiting for the Mayor Capone-Almon to arrive that I was not complying with the lawful instructions of East Haven Police Officer Michael Sorbo to complete towing cars from the parking lot to make the situation in the parking lot safer for pedestrians and for cars to get in and out of the parking lot.
>
> 13.    *After approximately five to ten minutes* after having this conversation with Erica Berg, I was approached by [Mayor Capone] . . .
>
> …
>
> 15.    *Later that night* I received a phone call from East Haven Police Officer Michael Sorbo who informed me he was investigating the conduct of Erica Berg and Mayor April Capone Almon that occurred at

> the beach parking lot earlier that day. *I informed Officer Sorbo of the facts set forth in paragraphs 1 through 14 above.*

A-184-85 (emphasis added).

The corrected affidavits doctrine requires courts to set aside "allegedly false material". *See, e.g., Cartier*, 955 F.2d at 845. Where there is evidence that suggests an officer may have put false statements in an affidavit, the court should ignore the potential falsehoods. Thus, the District Court set aside the so-called "first" and "third" acts described in the arrest warrant affidavit (taking tickets off of vehicles and/or taking a ticket from a woman and then walking away with her). A-259-60. The District Court held that Ms. Berg had submitted sufficient evidence to trigger the corrected affidavit doctrine and it ignored these portions of the affidavit because of their alleged falsehood. A-257-58. That is not at issue here.

The same cannot be said of Conway's affidavit, however. While Plaintiff disputes Conway's version of their conversation, her disagreement is with Mr. Conway, not Officer Sorbo. The District Court itself found that Plaintiff did not *and could not* submit any evidence about what Conway told Sorbo on the night of July 19, 2009. A-260 ("There is no evidence . . . that Ms. Berg has any personal knowledge of *what Mr. Conway told* Officer Sorbo about the conversation that took place between her and Mr. Conway."). Thus, it is an undisputed fact that Mr. Conway told Officer Sorbo the information contained in his affidavit. Therefore,

34

there is no evidence of a "false statement" by a police officer for the corrected affidavits doctrine to "correct". *Soares*, 8 F.3d at 917, 920. It is entirely reasonable for an officer to consider the statement of an eyewitness, even where that statement conflicts with the plaintiff/arrestee, and such eyewitness statements survive the corrected affidavits doctrine. *See, e.g., Magnotti*, 918 F.2d at 368 (finding qualified immunity as an officer "had reasonable grounds to believe probable cause sustained the warrant . . . [based on] numerous eyewitness accounts *which contradicted* [plaintiff]'s version of the arrest.") (emphasis added). Given that, the District Court erred in not considering the undisputed facts in Mr. Conway's affidavit as information "known to the applicant" at the time. *Escalera*, 361 F.3d at 743-44. *See Cournoyer*, 297 Fed. App'x at 19.

**IV.   *THE DISTRICT COURT ERRED IN ITS CONCLUSION THAT DEFENDANT IS NOT DUE QUALIFIED IMMUNITY***

The police are due "summary judgment on qualified immunity grounds if their actions were not objectively unreasonable at the time they were taken." *Lee v. Sandberg*, 136 F.3d 94, 102-03 (2d Cir. 1997). Thus, an officer is due qualified immunity so long as he had so-called "arguable probable cause". *Id.*; *Escalera*, 361 F.3d at 743. Such arguable probable cause exists where "reasonable officers could disagree as to whether probable cause exists." *Cartier*, 955 F.2d at 846. The test for qualified immunity is whether the officer behaved reasonably given the "totality of facts". *See Holeman v. City of New London*, 425 F.3d 184, 191 (2d Cir. 2005).

### A.   Connecticut's "interfering with an officer" statute

Plaintiff's arrest, which forms the basis of her claim, was for a violation of Conn. Gen. Stat. § 53a-167a. The question here, therefore, is whether there was arguable probable cause for an arrest under this law. The statute states:

> A person is guilty of interfering with an officer when such person *obstructs, resists, hinders* or endangers any peace officer . . . in the performance of such peace officer's . . . duties.

Conn. Gen. Stat. § 53a-167a(a) (emphasis added). "That law prohibits *any action—whether verbal or physical—*that is intended to meddle in or hamper the activities of the police in the performance of their duties." *White v. Wortz*, 66 F. Supp. 2d

331, 334 (D. Conn. 1999) (citing *State v. Williams*, 205 Conn. 456, 471 (1987) [*Williams I*]) (emphasis added). "The purpose of the law is to enforce orderly behavior in the important mission of preserving the peace." *Id.*

The District Court relied heavily on *Williams I*, which involved an appeal of a conviction where the defendant claimed that 53a-167a was either overly vague or overly broad with respect to verbal conduct.[7] The *Williams I* defendant argued that the statute's allegedly unclear language could have a chilling effect on speech, causing reasonable people to avoid speaking at all for fear of prosecution. *Williams I*, 205 Conn. at 469-72.

"We interpret § 53a-167a to cover some acts of verbal resistance as well as acts of physical resistance." *Id.* at 471. In finding that the statute covered verbal acts but was not unduly vague, the Connecticut Supreme Court reiterated that "[t]he statute's requirement of intent limits its application *to verbal conduct intended to interfere with a police officer* and excludes situations in which a defendant merely questions a police officer's authority or protests his or her action." *Id.* at 472 (emphasis added). *Williams I* stated a similar limitation to save the statute from the claim that it was overly broad. *Id.* at 473 ("we construe § 53a-

---

[7] The *Williams I* defendant had acted *physically*, not just verbally. *Williams I*, 205 Conn. at 468-69. The Court only reached the question of the statute's applicability to speech because challenges based on First Amendment liberties may be made facially, even where the defendant's "own conduct may clearly fall within the statute's prescriptions." *Id.* at 470 (collecting cases).

37

167a to proscribe only physical conduct and fighting words that by their very utterance inflict injury or tend to incite an immediate breach of the peace.") (internal quotation marks and citations omitted).

However, the Connecticut Supreme Court and Appellate Court have further explained the interference statute's reach in the thirty years since *Williams I*. Most notably, the Supreme Court twice recognized that "any act that is intended to thwart th[e statute's] purpose [of preserving the peace] is violative of the statute." *State v. Aloi*, 280 Conn. 824, 833-35 (2007). *See State v. Silva*, 285 Conn. 447, 455-61 (2008) (applying *Aloi*). Both *Aloi* and *Silva* involved defendants who refused to provide identification when ordered by the police.[8] *Aloi* provided a detailed summary of the reach of the interference statute:

> [53a-167a]'s words . . . have a broad scope. By using those words it is apparent that the legislature intended to prohibit *any* act which would amount to meddling in or hampering the activities of the police in the performance of their duties. . . The purpose of the statute . . . is to enforce orderly behavior in the important mission of preserving the peace; and **any act that is intended to thwart that purpose is violative of the statute**.
> . . .
> Because a refusal to provide identification . . . may hamper or impede a police investigation . . . we see no reason why such conduct would be categorically excluded under the expansive language of § 53a-167a. Indeed, the state expressly alleged in the information that the defendant had 'hinder[ed]' the police in the

---

[8] The *Aloi* defendant refused to provide identification as part of a *Terry v. Ohio* stop and the *Silva* defendant refused to in connection with a traffic infraction.

performance of their duties. **To hinder is defined as to make slow or difficult the course or progress of.** . . [A]s a general matter, a suspect's refusal to comply with a lawful police command . . . is likely to impede or delay the progress of the police investigation, even when that refusal is peaceable.

. . .

Thus, a refusal to comply with a police command . . . **may constitute a violation of § 53a-167a even if that refusal is unaccompanied by any physical force or other affirmative act**; § 53a-167a broadly proscribes conduct that hinders, obstructs or impedes a police officer in the performance of his or her duties **irrespective of whether the offending conduct is active or passive**.

*Aloi*, 280 Conn. at 833-34 (internal citations omitted) (italic emphasis in original, bold emphasis added).

The District Court erroneously treated this case as involving purely speech. However, had Plaintiff simply stood in the parking lot and stated "No! Wait for the Mayor!" to no one in particular, her speech would have had no effect. Instead, Ms. Berg engaged in a lengthy course of conduct which included getting out of her vehicle, observing the scene at the lot that she herself confirmed was "chaotic", learning about the police plan to tow the vehicles, and approaching a tow truck operator who had a vehicle up on his truck with the intent of getting him to not to that vehicle. Thus, Plaintiff "ma[d]e slow or difficult the course or progress of" Officer Sorbo's lawfully ordered plan to clear a public safety issue by instructing Mr. Conway to stop his towing until the mayor arrived. *See Aloi*, 280 Conn. at 834.

*Aloi*, decided just two years before the events of this case transpired, upheld the *conviction* of a man where his non-verbal conduct was effectively nothing: not providing identification. *See id.* at 833 n.14. Plaintiff's conduct, both verbal *and* non-verbal, went well beyond that, so is *at least* enough to provide an officer with arguable probable cause for an arrest.

The District Court also relied on *Ruttkamp v. De Los Reyes*, No. 3:10-cv-392, 2012 WL 3596064 (D. Conn. Aug. 20, 2012). In *Ruttkamp*, police were at a woman's home, investigating claims that she was holding her daughter against her will. *Id.* at *2-3. The police confirmed that she was not and began to leave. *Id.* As they exited, however, they received a further tip that the mother had left threatening voicemail messages on the daughter's phone and an officer asked the daughter to play them. *Id.* at *3. The mother protested, saying that the daughter did not have to, that the police needed a warrant, and that the police would get her in trouble. The mother was arrested for interference and, after the prosecutor entered *nolle prosequi* on the charges, she brought a § 1983 claim for false arrest and malicious prosecution. *Id.* at *4. *Ruttkamp* denied the police motion for summary judgment, relying on *Williams I* in holding that such verbal protests of an officer were not interference.

*Ruttkamp* was inapposite for several reasons, however. First and foremost, it dealt with a *request* that the daughter play a voicemail message, not a *lawful order*.

40

Here, as in *Aloi* and *Silva*, Plaintiff was hindering Officer Sorbo's lawful orders designed to preserve the peace and her actions impeded those orders. *See Aloi*, 280 Conn. at 833 ("The purpose of the statute . . . is to enforce orderly behavior in the important mission of preserving the peace; and any act that is intended to thwart that purpose is violative of the statute."). Moreover, the police in *Ruttkamp* were *investigating*, indeed they were actually leaving the scene after *completing* their investigation. Here, Officer Sorbo was responding to an ongoing public safety hazard and citizens' complaints that this hazard was causing cars to drive over an in-use playground and sidewalk. A-43, 204-05, 251. Thus, the present situation required far more immediate action, making Plaintiff's conduct fall within what is prohibited of the interference statute.

The District Court did not consider *State v. Peruta*, 24 Conn. App. 598, *cert denied*, 219 Conn. 912 (1991), which involves conduct directly analogous to Plaintiff's and supports a finding of arguable probable cause for Plaintiff's arrest. *Peruta* began with a fatal motor vehicle accident at an intersection with a ramp for I-91. *Id.* at 599. Police arrived at the scene and set in motion a plan intended to "maintain some limited traffic flow" and to "clear a portion of the road to establish a landing zone for the Life Star helicopter . . . [and so] officers could gather all necessary evidence from the scene." *Id.* at 600. The defendant was a photographer for a news service who began videotaping the scene from the middle of a traffic

41

lane. An officer asked him to move to the shoulder and, after a lengthy conversation, he did. *Id.* He returned a few minutes later, however, now videotaping from between two police cars. *Id.* at 601. The police again told him to move, but he refused and "insisted that the chief of police had given him permission to be where he was and told [the officer] that he had a constitutional right to be there and asserted that [the officer] had no authority to tell him to leave." *Id.* He was arrested *and convicted* for violating 53a-167a, and the Connecticut Appellate Court upheld his conviction. *Id.* at 599, 601-05.

*Peruta*, decided more than three years after *Williams I*, held that precedent established that the defendant could be guilty "if he either (1) intentionally moved into the immediate scene of the accident . . . after having been warned not to enter that area, or (2) moved into the forbidden area with the specific intention to hinder, obstruct or resist the officer." *Peruta*, 24 Conn. App. at 605. The facts of the present case support both types of wrongful behavior that *Peruta* held could justify a conviction, let alone provide *arguable probable cause* for an arrest.

Finally, precedent establishes that interference or delay of *any length* can be wrongful under the statute. *See, e.g., State v. Biller*, 5 Conn. App. 616, 621 (1985) (causing just a "delay" could be interference); *Aloi*, 280 Conn. at 843-44 ("*That delay need not have been substantial* to have constituted a hindrance for purposes of 53a-167a; rather, the delay need only have impeded the police to some

42

appreciable degree.") (emphasis added); *State v. Williams*, 110 Conn. App. 778, 794 n.8 (2008) (defining *Aloi*'s delay of "appreciable degree" as any delay that is "'noticeable,' that is capable of being measured.") [*Williams II*]. This comports with the language of 53a-167a, which contains no temporal minimums for the interference. Thus, conduct which impedes or delays police to an appreciable degree, meaning to any degree that is noticeable and/or capable of being measured, violates the statute.

Thirty years of precedent since *Williams I* confirms that conduct consisting primarily of speech and/or presence amounting to direct interference with lawful police actions, thus hindering an officer's duties, violates 53a-167a. *See Aloi*, 280 Conn. at 833-34 ("any act that is intended to thwart th[e] purpose [of preserving the peace] is violative of the statute."); *Silva*, 285 Conn. at 455-61; *Peruta*, 24 Conn. App. at 601-05; *Cruz v. Reilly*, No. 3:05-cv-1524, 2007 WL 2815151 at *1-4 (D. Conn. Sept. 26, 2007) (granting summary judgment to police over a § 1983 claim as there was at least arguable probable cause to arrest a man who, when police responded to a disturbance, (1) said he would "handle this", (2) repeatedly told another man to not speak with police, and (3) "extended his arm to separate [the other man] and the officers and said 'I'll take care of it.'") (*Droney, J.*).

Defendant is due qualified immunity, therefore, when the contents of Mr. Conway's affidavit are considered in the probable cause analysis.

43

## B. Defendant Is Due Qualified Immunity Given The Undisputed Facts In Conway's Affidavit

The undisputed facts of Mr. Conway's affidavit establish that Plaintiff inserted herself and thereby hindered Officer Sorbo's plan to correct the public safety issue ongoing at the beach parking lot. She "instructed" Mr. Conway to stop towing a vehicle because "the Mayor was going to deal with this situation", even after Mr. Conway told her that he was under police orders to tow. A-184-85. Plaintiff's instructions to Mr. Conway caused him to wait "approximately five to ten minutes" for the Mayor to arrive, during which time he was "concerned" that he was not following Officer Sorbo's lawful instructions. A-185.

Therefore, Sorbo had information that Plaintiff had intentionally inserted herself into his traffic control plan, disrupting his plan to preserve the peace. This is sufficient to support a *conviction* for interference, so certainly gives rise to arguable probable cause. *See Peruta*, 24 Conn. App. at 601-05. Even the District Court recognized that the "version of the Berg-Conway conversation set forth in *Mr. Conway*'s affidavit . . . is more detailed and more suggestive of interference." A-261 (emphasis in original). Conway's affidavit confirms that Plaintiff had continued to demand that Conway stop towing until the Mayor arrived, defying Sorbo's plan and instructions, *even after* Conway told her of Sorbo's instructions. A-185. Again, courts have repeatedly confirmed that conduct which impedes or hinders lawful police commands and therefore delays police operations supports a

44

*conviction* for interference, *Aloi*, 280 Conn. at 833-34, 841; *Silva*, 285 Conn. at 455-61, so must support at least arguable probable cause. *See, e.g., Cruz*, 2007 WL 2815151 at *1-4.

In *Peruta*, the defendant also tried telling the police "that the chief of police had given him permission to be where he was", invoking the authority of a non-present person to justify his obstructive conduct. *Peruta*, 24 Conn. App. at 601. The same is true here: even after being told of Officer Sorbo's orders, Plaintiff "instructed" Conway to wait for the Mayor because "the Mayor was going to deal with this situation." A-184-85.

Plaintiff's actions were especially problematic because her communications were with a third party, Mr. Conway, who was acting pursuant to direct police orders. An interaction with an officer may be less troublesome because that officer knows his own authority. Mr. Conway, however, was carrying out Officer Sorbo's orders without Sorbo's actual presence when Plaintiff arrived. Plaintiff therefore put Conway in a difficult situation that Conway himself confirmed caused concern: Do I obey the police or the Mayor? While the officers in *Peruta* knew the truth— that the defendant was not allowed to be where he was—Mr. Conway did not know whether Officer Sorbo's or the Mayor's authority controlled. Thus, Plaintiff's invocation of the mayor's authority caused greater interference and therefore provided further arguable probable cause for her arrest.

45

Moreover, that Plaintiff disputes Conway's version of events does not mean that a reasonable officer could not rely on Conway's statements. Police often hear conflicting stories during investigations, but such officers are still due qualified immunity if they act reasonably based on one or the other. *See, e.g., Magnotti*, 918 F.2d at 368 (finding qualified immunity as an officer "had reasonable grounds to believe probable cause sustained the warrant . . . [based on] numerous eyewitness accounts *which contradicted* [plaintiff]'s version of the arrest.") (emphasis added).

Police are not required to act *only* where they have an uncontroverted narrative from everyone or else risk litigation. *See Curley v. Village of Suffern*, 268 F.3d 65, 70 (2d Cir. 2001). Such a rule would paralyze the police and be at odds with the purpose of qualified immunity. "The arresting officer does not have to prove plaintiff's version wrong before arresting [her]." *Id.* (citing *Krause v. Bennett*, 887 F.2d 362, 372 (2d Cir. 1989)). "Once a police officer has a reasonable basis for believing there is probable cause, he is not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest." *Ricciuti*, 124 F.3d at 128.

Conway's affidavit shows that Plaintiff delayed the towing by approximately five to ten minutes, thus "imped[ing] the police to some appreciable degree." *Aloi*,

46

280 Conn. at 843-44; *Williams II*, 110 Conn. App. at 794 n.8.[9] Given what Defendant observed, what Conway told Defendant, the overall totality of the circumstances of July 19, 2009, and the existing precedent regarding the interference statute, reasonable officers could have at the very least disagreed as to whether or not probable cause existed for Plaintiff's arrest.

Therefore, as argued above, Officer Sorbo is due qualified immunity on Plaintiff's claims as at least *arguable* probable cause existed for his arrest of Plaintiff based on the version of events told to him by John Conway on the evening of July 19, 2009 and memorialized in his subsequent affidavit.[10]

### C.    Defendant Is Also Due Qualified Immunity Based Purely On The Facts Found Undisputed By The District Court

Even if this Court disagrees that the corrected affidavits doctrine requires consideration of the facts contained in John Conway's affidavit, Defendant is still

---

[9] Defendant focuses on this delay as it was solely due to Plaintiff's actions. Further, considering the totality of the circumstances for arguable probable cause, the Court should also consider the larger picture. Officer Sorbo knew that (1) Plaintiff, who worked for the Mayor and arrived at the parking lot in the same car as the Mayor, had Conway stop and wait for the Mayor, (2) the Mayor repeatedly instructed Conway to stop towing, and (3) Conway stopped towing and left. Given that Plaintiff was the Mayor's assistant, reasonable officers could believe that Berg and Mayor Capone's conduct was interrelated and part of a collective scheme to "stop the nonsense" as Plaintiff put it. Thus, it was also reasonable for Defendant to consider the overall conduct of both that ultimately stopped the towing entirely.

[10] Any analysis which includes Conway's affidavit is of course further bolstered by the arguments made below with regards to the arrest warrant affidavit itself.

owed qualified immunity as arguable probable cause existed on the facts the District Court found remained in the "corrected" arrest warrant affidavit.

The District Court noted that Officer Sorbo spent only a portion of the arrest warrant affidavit describing Plaintiff's conduct. A-260-62. That portion of the affidavit reads:

> I observed a town employee, Erica Berg, who is the secretary in the mayor's office, who had *stopped* one of the tow truck drivers, known to me as John [Conway]. . . *[A] few minutes elapsed*, and then I observed Mayor [Capone] . . . also talking with the tow truck operators.
> . . .
> I spoke with the two tow truck operators, Michael Sarno and John [Conway], as to what was said between them . . . . John stated, that Erica Berg first approached him, before the mayor's arrival and asked him not to leave with the car that he had in tow, that the Mayor was on her way there.

A-198-99 (emphasis added).

Thus, even the facts considered by the District Court show (1) that Plaintiff had inserted herself into an ongoing police response to a public safety issue, (2) that she caused a tow truck driver to disregard the lawful police towing plan for "a few minutes", and (3) that she specifically asked Conway to wait for the Mayor. As argued above, such conduct provides *at least* arguable probable cause for an arrest under 53a-167a given cases like *Aloi*, *Silva*, *Peruta*, and *Cruz*.

Therefore, even if this Court only considers the relevant sections of the arrest warrant affidavit, there still exists arguable probable cause for Plaintiff's

arrest for interference.[11] Therefore, Defendant is due qualified immunity, even on those more limited facts.

---

[11] The main difference between the arrest warrant affidavit and John Conway's affidavit is that Mr. Conway actually told Sorbo slightly more detail on his conversation with Plaintiff. He specifically stated that (1) Plaintiff asked him to stop towing the car he had up, (2) he told her that he had legal instructions from Sorbo to tow the car, and that *nonetheless* (3) she then "instructed" him not to leave because the Mayor "was on her way . . . and the Mayor was going to deal with the situation." A-184-85. The arrest affidavit describes the same conversation and says that Plaintiff told Conway not to leave because the Mayor was on the way, but does not explain the back-and-forth between Conway and Berg wherein he tells her of Officer Sorbo's orders but she nonetheless instructs him to stop his towing activity. While these details are helpful, even the arrest warrant affidavit describes conduct for which, at least, reasonable officers could disagree as to whether or not there was probable cause for an arrest.

49

## **CONCLUSION**

For the reasons set forth above, the decision of the District Court denying Officer Sorbo summary judgment as to the claims against him under 42 U.S.C. § 1983 should be reversed and judgment should enter for Officer Sorbo on those claims.

DEFENDANT-APPELLANT
MICHAEL SORBO,


Dated July 24, 2014          By:     S/ John F. Conway, Esq.
                                         John F. Conway
                                    LOUGHLIN FITZGERALD, P.C.
                                    150 South Main Street
                                    Wallingford, CT 06492
                                    Tel.: (203) 265-2035
                                    Fax: (203) 269-3487
                                    E-mail: jconway@lflaw.com

## <u>DEFENDANT-APPELLANT'S</u>
## <u>RULE 32(a)(7) COMPLIANCE CERTIFICATION</u>

1.     This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B)  because:

     a.     This brief contains 12,259 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

     a.     This brief has been prepared in a proportionally-spaced typeface using Microsoft Word version 2013 in font size fourteen (14) and type style Times New Roman.

DEFENDANT-APPELLANT
MICHAEL SORBO,


Dated July 24, 2014          By: <u>S/ John F. Conway, Esq.</u>
John F. Conway
LOUGHLIN FITZGERALD, P.C.
150 South Main Street
Wallingford, CT 06492
Tel.: (203) 265-2035
Fax: (203) 269-3487
E-mail: jconway@lflaw.com

51